FILED
OCT 0 5 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RICHARD LEON McKENZIE,

                Plaintiff,

      v.

MAUREEN ROSSI-HILL, MS. T.
CUTLER, THERESA HICKS, RONALD
D. MEYERS, JEAN HILL, LT. L
ALBERTS, OFF. MANO, OFF. JOHN
DOE, each sued in their individual as well
as their official capacities,

                Defendants.

Civ. No. 07-1752-AC

FINDINGS AND
RECOMMENDATION

ACOSTA, Magistrate Judge:

*Introduction*

    Plaintiff Richard Leon McKenzie ("McKenzie"), a prisoner of the State of Oregon,

brings this action against Defendants Rossi-Hill *et al.* ("the Defendants"), employees of the

Oregon Department of Corrections, alleging that the Defendants denied McKenzie access to the

courts, denied him due process at disciplinary hearings, and retaliated against him when he

exercised his constitutional rights.   Before the court is the Defendants' motion for summary judgment.

First, because McKenzie has not presented evidence of a required element of his claim that he was denied access to the courts, summary judgment should be granted to the Defendants on this claim.  Second, because the Defendants complied with the Supreme Court's requirements for due process at each of the disciplinary hearings, summary judgment should be granted for the Defendants on McKenzie's due process claim.  Finally, because McKenzie has not presented evidence to establish a causal link between the protected activity and the alleged retaliation, summary judgment should be granted for the Defendants on McKenzie's retaliation claim.

*Background*

McKenzie is an Oregon Department of Corrections ("ODOC") inmate housed at the Snake River Correctional Institution ("SRCI") in Ontario, Oregon.   (Am. Compl. ¶ 3.) McKenzie brings this complaint against eight named defendants and one unnamed defendant. Five of these defendants are employed by ODOC at the SRCI;   Maureen Rossi-Hill ("Rossi-Hill") is a correctional library coordinator, (Answer to Am. Compl. ¶ 2.); Tina Cutler ("Officer Cutler") is a correctional officer, (Answer to Am. Compl. ¶ 3.); Teresa Hicks ("Grievance Coordinator Hicks") is a grievance coordinator, (Answer to Am. Compl. ¶ 4.); Ron Myers ("Hearings Officer Myers") is a hearings officer, (Answer to Am. Compl. ¶ 5.); and Mary Jean Winter is the Acting Transitional Services Manager, (Answer to Am. Compl. ¶ 7.).  The sixth defendant, Jean Hill, is employed by ODOC as Superintendent of the Powder River Correctional Facility in Baker City, Oregon.   (Answer to Am. Compl. ¶ 6.)   McKenzie also names as

defendants an alleged lieutenant correctional officer named "L. Alberts," an alleged correctional officer named "Mano," and an alleged unnamed correctional officer. (Am. Compl. ¶¶ 9-11.) The Defendants do not acknowledge the existence of these last three defendants. (Answer to Am. Compl. ¶ 9.)

On February 9, 2007, Officer Cutler observed McKenzie and another inmate, Randolph Nelson ("Nelson"), exchange the computer storage discs that they had been assigned to use while researching in the SRCI law library ("the library" or "the law library"). (Affidavit of Maureen Rossi-Hill ("Rossi-Hill Aff."), Ex. 6 at 2.) "There is a written order in the law Library that the inmates are not allowed to exchange discs with each other." (Rossi-Hill Aff., Ex. 6 at 2.) The library staff maintains copies of the "quick reference manual" next to each word processor for the inmates to use. (Affidavit of Tami Noe-Greene ("Noe-Greene Aff."), Ex. 1 at 6.) The second page of each manual provides that sharing files or discs between inmates is unauthorized. (Noe-Greene Aff., Ex. 1 at 6.)

Officer Cutler seized the computer discs used by McKenzie, (Am. Compl. ¶ 13.), and Nelson, (Declaration of Randolph Nelson ("Nelson Decl.") ¶ 6.). Six documents with McKenzie's name[1] were found on Nelson's computer disc, (Nelson Decl. ¶ 10; Rossi-Hill Aff., Ex. 6 at 2.), and "[a] confidential informant stated that inmate McKenzie had possessed inmate Nelson's disc," (Rossi-Hill Aff., Ex. 6 at 2.). When Officer Cutler reviewed the documents on McKenzie's disc, she discovered a document that referred to Lane County case number

---

[1] Some documents may have been identified as belonging to McKenzie by the presence of case numbers that pertained to McKenzie's pending actions. (*See* Noe-Greene Aff., Ex. 6.)

200525895, which pertained to inmate Jesse Smith but not to McKenzie. (Noe-Greene Aff., Ex. 1 at 7.)

The SRCI inmate handbook provides that legal documents belonging to other inmates are contraband, and possession of such is prohibited. (Noe-Greene Aff., Ex. 6.) ODOC Rule 291-139-0010 defines legal documents as "[p]leadings (i.e., complaint, petition or answer), legal motions and memoranda, affidavits, court orders and judgments, or other necessary papers submitted to a court in connection with a legal action." (Noe-Greene Aff., Ex. 1 at 7.) Because McKenzie's computer disc contained contraband, it has not been returned to him. (Rossi-Hill Aff., Ex. 19 at 1-4.)

At the time his disc was confiscated, McKenzie had two actions pending in the Oregon Court of Appeals for which he needed to submit motions and other documents as a pro se appellant, and the disc contained documents for these cases. (Am. Compl. ¶ 18.) The court will refer to case number A134890 as McKenzie's "Civil Appeal" and case number A129351 as his "Criminal Appeal."

On February 12, 2007, McKenzie filed a grievance with SRCI staff claiming that the seizure of his computer disc denied him access to the courts. (Am. Compl. ¶ 14.) Grievance Coordinator Hicks reviewed and rejected this grievance. (Am. Compl. ¶ 15.)

McKenzie was denied access to the law library on February 12, 2007, (Am. Compl. ¶ 13.) and he alleges that he "missed every filing date for these cases since February 12, 2007, as a result of the events described in this complaint," (Am. Compl. ¶ 18.). Despite this allegation, the case registers of his Civil Appeal and his Criminal Appeal show that McKenzie submitted

FINDINGS AND RECOMMENDATION          4                                        {DL}

several court documents within one month after February 12, 2007. (Affidavit of Jennifer Andrew ("Andrew Aff."), Ex. 1.) For his Criminal Appeal, McKenzie submitted motions on February 26, 2007, and February 28, 2007.[2] (Andrew Aff., Ex. 1 at 2.) For his Civil Appeal, McKenzie submitted a Notice of Appeal, the initiating document, on February 26, 2007.[3] (Andrew Aff., Ex. 1 at 5.)

On March 6, 2007, Officer Cutler issued a misconduct report against McKenzie.[4] (Am. Compl. ¶ 15.) Hearings Officer Myers conducted hearings on March 13, 2007, and April 2, 2007. (Rossi-Hill Aff., Ex. 6 at 1.) The report for these hearings indicates that McKenzie "received a copy of the Misconduct Report, Notice of [the] Hearing, Notice of Inmate Rights in a Hearing and Rules of Prohibited Conduct" and that he acknowledged that he understood each of them. (Rossi-Hill Aff., Ex. 6 at 1.) Hearings Officer Myers granted McKenzie's request for witnesses. (Rossi-Hill Aff., Ex. 6 at 2.)

Nelson, who apparently testified as a witness for McKenzie, explained that he was using the documents containing McKenzie's name as mere templates, and that "[Nelson] had typed in

---

[2] For his Criminal Appeal, McKenzie also submitted documents to the Oregon court on April 18, May 17, May 29, June 22, August 29, September 20, September 25, and December 6 of 2007, as well as March 28, May 19, July 18, September 22, October 6, and November 10 of 2008 for a total of eighteen documents filed after February 12, 2007. (Andrew Aff., Ex. 1 at 1-2.)

[3] For his Civil Appeal, McKenzie also submitted documents to the Oregon court on April 11, May 21, June 14, July 16, September 25, October 22, December 06, and December 18 of 2007, as well as January 10, January 29, and February 28 of 2008 for a total of sixteen documents filed after February 12, 2007. (Andrew Aff., Ex. 1 at 4-5.)

[4] Inmate Nelson also "received a misconduct . . . for allegedly misusing the computer system to do unauthorized legal work." (Nelson Decl. ¶ 7.)

FINDINGS AND RECOMMENDATION          5                    {DL}

Richard McKenzie's name as the form indicated so that [he] would know where to later place [his own] name on the documents." (Nelson Decl. ¶ 10.) Nelson attests that "at no time had Richard McKenzie ever transferred anything from his storage disc to mine." (Nelson Decl. ¶ 9.) McKenzie did assist Nelson in his legal work, but "McKenzie had not requested any form of compensation" for doing so. (Nelson Decl. ¶ 13.)

On April 2, 2007, after further investigation, Hearings Officer Myers determined that McKenzie violated ODOC Rules of Conduct. (Am. Compl. ¶ 16.) He found that McKenzie had violated Rule 1g(C), Unauthorized Use of Information Systems I, by performing unauthorized legal work that exceeded the use or access he had been granted. (Rossi-Hill Aff., Ex. 6 at 4; Am. Compl. ¶ 16.) Hearings Officer Myers also found that McKenzie had violated Rule 4(b), Disobedience of an Order II, by "overtly refus[ing] to follow a valid order." (Rossi-Hill Aff., Ex. 6 at 4; Am. Compl. ¶ 16.)[5] Consequently, McKenzie was sanctioned with a $100 fine and forty-two days in the Disciplinary Segregation Unit ("DSU"), beginning on April 2, 2007, and ending on May 13, 2007. (Rossi-Hill Aff., Ex. 6 at 3.) McKenzie also lost certain privileges for the fourteen days following his release from the DSU.[6] (Rossi-Hill Aff., Ex. 6 at 3.)

On May 17, 2007, four days after he was released from the DSU, McKenzie was involved in another incident in the law library. (Rossi-Hill Aff., Ex. 8 at 1.) "[He] was in the SRCI law library and had prepared, and printed, a motion for extension (MOET) and a complaint

---

[5] The third charge, violation of Rule 1f, Contraband III, was dismissed due to insufficient evidence. (Rossi-Hill Aff., Ex. 6 at 4.)

[6] The record does not indicate what privileges were taken from McKenzie during this period.

for contempt of court naming [Officer] Cutler and [Hearings Officer] Meyers in [McKenzie's Criminal Appeal] case no. A129351."[7]  (Am. Compl. ¶ 19.)  McKenzie requested that these documents be printed from his computer disc, and Rossi-Hill printed them.  (Am. Compl. ¶ 19.) After she read the documents, "Rossi-Hill called 6-7 [inmates] to the front desk to receive their documents printed from their respective discs."  (Am. Compl. ¶ 19.)  As McKenzie approached the front desk, he "bumped into" Inmate Jesse Smith ("Smith").  (Am. Compl. ¶ 19; Declaration of Jesse Smith ("Smith Decl.") ¶ 11.)

Rossi-Hill witnessed this interaction and said to McKenzie and Smith, "What did he give you?" and "Where's the disc?"  (Am. Compl. ¶ 19; Smith Decl. ¶ 13.)  Rossi-Hill collected the printed documents from McKenzie and Smith and used a button to summon security staff to the scene.[8]  (Am. Compl. ¶ 19.)  The security staff removed McKenzie and Smith from the law library and "strip searched" them.  (Am. Compl. ¶ 20; Smith Decl. ¶ 14.)  Smith attests that "at no time was Richard McKenzie ever in physical possession of any of [Smith's] legal work,"

---

[7] The case register for McKenzie's Criminal Appeal indicates that McKenzie submitted to the Oregon court a motion for an extension of time ("MOET") and another motion on May 17, 2007, and both were officially received on May 24, 2007.  (Andrew Aff., Ex. 1 at 2.)

[8] In a letter dated June 22, 2007, to Inspector Jeff Morford, Rossi-Hill explained her decision on May 17, 2007, to activate the button that summoned security staff to the law library.  (Rossi-Hill Aff., Ex. 8 at 1.)  She had been aware that "[o]n February 9, 2007, Inmate McKenzie was issued a Misconduct Report for exchanging computer disks with another inmate."  (Rossi-Hill Aff., Ex. 8 at 1.)  On May 17, 2007, "having been released from Segregation for the 2/9/07 incident only four days" earlier, McKenzie was engaging in, what Rossi-Hill perceived to be "the same conduct, with the same inmate."  (Rossi-Hill Aff., Ex. 8 at 1.)  Rossi-Hill's decision to push the alarm was prompted by her perception that "McKenzie did not show he was capable of making good judgment" and the fact that "there [were] at least 35 inmates in the law library and no other staff but [Rossi-Hill] present."  (Rossi-Hill Aff., Ex. 8 at 1.)

FINDINGS AND RECOMMENDATION        7                        {DL}

(Smith Decl. ¶ 7.), although Smith also admits that "[he] allowed Richard McKenzie to use a copy of [Smith's] filed petition to use as a template to create his own petition," (Smith Decl. ¶ 17.).

Rossi-Hill confiscated all of McKenzie's legal materials, including his legal archive box. (Am. Compl. ¶ 21.) McKenzie's legal archive box contained the legal documents of several other inmates and other items. (Rossi-Hill Aff., Ex. 3 at 1.) Specifically, the box contained an "envelope addressed to Inmate Denton, R." from an attorney; an "Appellant's Brief", an "Excerpt of Record," a "Sentencing Opinion," and a "Pro Se Supplemental Appellant's Brief" belonging to inmate Chris Cobb; a "Complaint" by Inmate Daniel Holterman ("Holterman"); a "legal envelope sent to Holterman, marked Legal Mail, and sent from Office of Public Defense;" a "legal envelope sent to Holterman from the United States District Court;" "[l]egal work belonging to Inmate Jessie [sic] Smith found concealed in case law;" and an envelope from Smith to McKenzie "containing a 1 page letter from Smith to McKenzie instructing McKenzie to 'keep working on my case . . . .'" (Rossi-Hill Aff., Ex. 3 at 1-2.) Also present in the box were an envelope marked as legal mail, in which "handwritten, step by step, instructions on Stocks, Bonds & Securities" were "folded inside [a] non-legal notice from Washington County Circuit Court to McKenzie;" a photocopied "publication entitled, *The Ultimate Internet Outlaw — How Surfers Steal Sex, Software, CDs, Games and More Top-Secret Stuff on the Information Superhighway*;" a "photocopy demonstration of a lock being picked or broken into;" two "indigent envelopes;" approximately forty sheets of printed "case law" with notes written throughout; and a computer disc containing nine files. (Rossi-Hill Aff., Ex. 3 at 2.)

FINDINGS AND RECOMMENDATION          8                              {DL}

From May 17, 2007, to June 9, 2007, McKenzie was denied access to legal reference materials. (Am. Compl. ¶ 25.) From May 17, 2007 to November 9, 2007, McKenzie was prohibited from checking out printed cases from the law library, and he was only allowed access to the library in "limited circumstances." (Am. Compl. ¶ 40.)

McKenzie filed five grievances with SRCI staff between May 20, 2007, and May 23, 2007. (Am. Compl. ¶ 29.) In these grievances, McKenzie alleged "denial of access to the courts, [improper] seizure of his legal materials and [] retaliation against him for his legal filings." (Am. Compl. ¶ 29.) Grievance Coordinator Hicks reviewed and rejected each of these grievances. (Am. Compl. ¶ 29.)

On or around[9] June 6, 2007, Rossi-Hill observed McKenzie talking to Inmate James Young ("Young") in the law library. (Am. Compl. ¶ 26; Defendants' Concise Statement of Material Facts ("CSMF"), Ex. 1 at 3.) Rossi-Hill approached McKenzie and Young and reminded them of the posted rule that prohibits inmates from talking while in the law library. (Rossi-Hill Aff., Ex. 10 at 1.) Rossi-Hill warned Young and allowed him to stay in the library because "he had not been previously warned of his conduct." (Rossi-Hill Aff., Ex. 10 at 1.) However, Rossi-Hill terminated McKenzie's "call out" to the library because SRCI staff had "warned McKenzie on 5/18/07 that he would be told to leave if [he was] found conversing with other inmates while on call out in the law library." (Rossi-Hill Aff., Ex. 10 at 1.) Rossi-Hill read the documents lying on the table between the inmates, (Rossi-Hill Aff., Ex. 10 at 1; Am.

---

[9] The ODOC's disciplinary hearing findings of fact state that this event occurred on June 7, 2007. (Defendants' CSMF, Ex. 1 at 3.)

Compl. ¶ 27.), one of which was McKenzie's complaint under 42 U.S.C. 1983 ("1983 Complaint") naming Rossi-Hill as a defendant, (Am. Compl. ¶ 27.).

"Rossi[-Hill] ordered inmate McKenzie to leave the law library . . . ." (Defendants' CSMF, Ex. 1 at 3; *accord* Am. Compl. ¶ 27.) As McKenzie was walking toward the door Rossi-Hill observed that McKenzie was holding documents that she had not reviewed, and she ordered him to stop. (Rossi-Hill Aff., Ex. 10 at 1; Am. Compl. ¶ 27.) McKenzie did not stop promptly as ordered, and Rossi-Hill ordered McKenzie to stop two more times. (Rossi-Hill Aff., Ex. 10 at 1.) McKenzie did not obey these orders either, and Rossi-Hill called security staff for assistance.[10] (Rossi-Hill Aff., Ex. 10 at 1.) The security staff escorted McKenzie out of the law library and placed him in the DSU. (Am. Compl. ¶ 27.) McKenzie's section 1983 Complaint has not been returned to him. (Am. Compl. ¶ 27.)

On June 7, 2007, McKenzie was issued a misconduct report alleging Disobedience of an Order II and Disrespect II for his actions on June 6, 2007. (Am. Compl. ¶ 28.) On June 8, 2007, he filed another grievance, which was rejected. (Am. Compl. ¶ 29.) Hearings Officer Myers conducted a disciplinary hearing on June 12, 2007. McKenzie had "received a copy of the Misconduct Report, Notice of [the] Hearing, Notice of Inmate Rights in a Hearing and Rules of Prohibited Conduct," and he had acknowledged that he understood each of these. (Rossi-Hill Aff., Ex. 9 at 1.) McKenzie's request for witnesses was granted. (Rossi-Hill Aff., Ex. 9 at 1.) After the hearing, Hearings Officer Myers concluded that McKenzie had violated Rule 4a,

---

[10] "There were approximately 30 to 35 inmates in the law library at the time the incident occurred." (Rossi-Hill Aff., Ex. 10 at 1.)

Disobedience of an Order I, because he "overtly refused to promptly, or in a timely manner, comply with a valid order." (Rossi-Hill Aff., Ex. 9 at 2; *accord* Am. Compl. ¶ 28.) McKenzie was sanctioned with fourteen days in the DSU, beginning June 7, 2007,[11] and ending on June 20, 2007. (Rossi-Hill Aff., Ex. 9 at 3.)

On June 12, 2007, while McKenzie was housed in the DSU, Rossi-Hill personally returned some of the items that SRCI staff had confiscated from McKenzie's legal archive box on May 17, 2007. (Rossi-Hill Aff. ¶ 30.) She returned only those items that McKenzie was authorized to possess, and she gave him a "Shakedown Report" that listed and described the unauthorized materials. (Rossi-Hill Aff. ¶ 30.)

On June 22, 2007, McKenzie was issued a misconduct report regarding his behavior on May 17, 2007. (Am. Compl. ¶ 30.) He was charged with violation of Rule 1e, [Possession of] Contraband II, Rule 1g, Unauthorized Use of Information Systems I, and Rule 4b, Disobedience of an Order II. (Rossi-Hill Aff., Ex. 7 at 1.) A different hearings officer, Joan Davies ("Hearings Officer Davies"), held a disciplinary hearing on June 26, 2007. (Rossi-Hill Aff., Ex. 7 at 1.) McKenzie "received a copy of the Misconduct Report, Notice of [the] Hearing, Notice of Inmate Rights in a Hearing and Rules of Prohibited Conduct," and he acknowledged that he understood each of these. (Rossi-Hill Aff., Ex. 7 at 1.) Hearings Officer Davies postponed the hearing to conduct further investigation, and she later dismissed the charges against McKenzie on August 7, 2007, "due to insufficient evidence." (Rossi-Hill Aff., Ex. 7 at 1.)

---

[11] Apparently, McKenzie began serving his sentence in DSU while the investigation was still pending.

FINDINGS AND RECOMMENDATION          11                              {DL}

McKenzie requested immediate return of all the legal materials that Rossi-Hill had confiscated on May 17, 2007. (Am. Compl. ¶ 35.) On August 9, 2007, "more" of McKenzie's legal work was returned to him. (Am. Compl. ¶ 33.) However, the "entire court record" was not returned to him. (Am. Compl. ¶ 33.) The specific items that McKenzie identifies as missing from the court record are two pieces of evidence used at trial: "Secrets of an Internet Outlaw"[12] and "Secrets of Lock Picking." (McKenzie Decl. ¶ 15.)

On August 24, 2007, McKenzie paid for and received the discovery materials he requested from ODOC regarding his habeas corpus proceeding in Malheur County Circuit Court, case number 0706-5922-H. (Am. Compl. ¶¶ 32, 36.) SRCI staff redacted portions of the requested documents, and McKenzie alleges that the documents in their censored form are useless to him and do not support his contentions. (Am. Compl. ¶ 36.) This habeas corpus proceeding was later dismissed. (Am. Compl. ¶ 32.)

On September 6, 2007, McKenzie wrote to the Acting Transitional Services Manager, Mary Jean Winter ("Manager Winter"), to request the documents from the computer disc that Officer Cutler had confiscated on February 9, 2007. (Rossi-Hill Aff., Ex. 19 at 1; Am. Compl. ¶ 37.) On September 10, 2007, Manager Winter responded to McKenzie's request by writing that

> "[t]his issue was resolved when [McKenzie was] provided the opportunity to transfer file[s] from [his] legal disks onto [his] working disk. The matter is now moot, as [he has] been using the temporary disk for several weeks, having had the opportunity to transfer all files that related to [his] active cases."

---

[12] The inventory of McKenzie's legal archive box indicates that this publication was entitled *The Ultimate Internet Outlaw – How Surfers Steal Sex, Software, CDs, Games and More Top-Secret Stuff on the Information Superhighway.* (Rossi-Hill Aff., Ex. 3 at 2.)

(Rossi-Hill Aff., Ex. 19 at 1; *accord* Am. Compl. ¶ 38.) McKenzie wrote to Manager Winter two more times,[13] each time reiterating his request to access files that were on the confiscated disc.[14] (Rossi-Hill Aff., Ex. 19 at 2-4.) McKenzie stated that he had been allowed to transfer files from one temporary disc to another, but he had not been allowed to access or transfer files from the confiscated disc since Officer Cutler had seized it. (Rossi-Hill Aff., Ex. 19 at 2.)

On November 7, 2007, McKenzie requested "indigent legal envelopes to mail copies of the original complaint[15] to the therein named defendants," but his request was denied based on his intended use. (Am. Compl. ¶ 39 (footnote inserted).)

On November 27, 2007, McKenzie was scheduled to use the law library in the morning and in the afternoon. (Am. Compl. ¶ 41.) He used the library in the morning, but he "was forcibly turned away from the law library by security staff" when he attempted to use the library in the evening. (Am. Compl. ¶ 41.) McKenzie alleges that Rossi-Hill said, "I do not want him in the library, he has enough on me already, I want him out of here." (Am. Compl. ¶ 42.)

McKenzie also alleges that he "had a legal mailing that had to go out that day to be timely filed." (Am. Compl. ¶ 41.) The case registers of McKenzie's Civil Appeal and Criminal Appeal both indicate that McKenzie submitted several court documents soon after November 27,

---

[13] October 9, 2007, and November 21, 2007. (Rossi-Hill Aff., Ex. 19 at 2-4.)

[14] McKenzie also argues that the disc should be returned to him because it was Nelson's disc, not McKenzie's disc, that contained files of another inmate (i.e., McKenzie) in violation of ODOC rules. (Rossi-Hill Aff., Ex. 19 at 3, 4.)

[15] McKenzie does not identify the complaint to which he refers. Therefore, the court presumes McKenzie is refering to the complaint for the instant case.

2007. (Andrew Aff., Ex. 1.)  For his Civil Appeal, McKenzie submitted four documents to the Oregon court in early December 2007: one on December 4, one on December 6, and two on December 18. (Andrew Aff., Ex. at 4.)  For his Criminal Appeal, McKenzie submitted one document to the Oregon court on December 6, 2007. (Andrew Aff., Ex. at 1.)

On February 24, 2008, correctional officers Mano and Alberts searched McKenzie's housing unit in McKenzie's presence as part of an "investigation into plaintiff['s] doing legal work for other inmates for pay." (Am. Compl. ¶ 43.)  "After the search plaintiff's legal materials were in total disarray, documents and file folders torn or destroyed and several items seem to be missing, notably declarations from inmates supporting plaintiff's allegations in this and other cases." (Am. Compl. ¶ 43 (internal quotation marks omitted).)

*Legal Standard*

1.  <u>Summary Judgment</u>

"A party against whom relief is sought may move at any time, with or without supporting affidavits, for summary judgment on all or part of the claim." FED. R. CIV. P. 56(b).  The court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Ricci v. DeStefano*, 129 S.Ct. 2658, 2677 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (internal quotation marks omitted).  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the

FINDINGS AND RECOMMENDATION          14                          {DL}

governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party is not required to present evidence negating the non-moving party's claim; it must simply point out that the non-moving party has not made a sufficient showing on an essential element of its claim for which it bears the burden of proof. *Id.* The burden then shifts to the non-moving party to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). This requires more than "simply show[ing] that there is some metaphysical doubt as to the material facts," *Matsushita Electric Industrial Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or making conclusory allegations, even if they are submitted in an affidavit, *Lujan v. Natl. Wildlife Federation*, 497 U.S. 871, 888 (1990). In sum, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).

2.    <u>42 U.S.C. 1983</u>

The substantive laws at issue in this case are 42 U.S.C. 1983 ("Section 1983") and the federal laws and constitutional provisions that Section 1983 implicates by reference. In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the

jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. 1983. It is well established that "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Relief under Section 1983 requires "(1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

*Discussion*

1.    Summary Judgment

Because McKenzie has stated under penalty of perjury that the facts alleged in his Amended Complaint are true and correct, *see Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995), the court will treat the Amended Complaint as an "affidavit to oppose summary judgment to the extent it is 'based on personal knowledge' and 'sets forth specific facts admissible in evidence,'" *Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996) (quoting *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam)).

McKenzie seeks additional discovery before summary judgment is granted. "A party requesting a continuance pursuant to Rule 56(f) must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City and County of S.F.*, 441 F.3d 1090, 1100 (9th Cir. 2006). McKenzie

has not identified the specific facts he seeks to elicit. (*See* Mot. to Compel) Therefore, his discovery request is denied.

2.    42 U.S.C. 1983

    A.    Access to the Courts

McKenzie claims that the Defendants violated his constitutional right to access the courts by denying him access to the law library, by confiscating some of his legal materials, and by denying him legal envelopes on one occasion.

The Supreme Court has "established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977), *limited in part on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996). This right is derived from the "[F]irst [A]mendment right to petition the government for redress of grievances." *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989); *accord Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). It has also "been described as a consequence of the right to due process of law and as an aspect of equal protection." *Murray v. Giarratano*, 492 U.S. 1, 11 n.6 (1989) (citations omitted). Allowing prisoners to access the courts "ensure[s] that the unlawfully detained obtain their freedom and that the lawfully detained have recourse for violation of fundamental constitutional rights." *Cornett v. Donovan*, 51 F.3d 894, 898 (9th Cir. 1995) (citations omitted). Providing prisoners access to the courts "guarantees no particular methodology." *Lewis*, 518 U.S. at 356. To the contrary, the Supreme Court has "encourage[d]

local experimentation" as long as the prison's program, when evaluated as a whole, complies with constitutional standards.[16] *Bounds*, 430 U.S. at 832.

The Supreme Court has held that a prisoner challenging the constitutional standards of the prison must prove that he suffered an "actual injury," *Lewis*, 518 U.S. at 349, which requires him to "demonstrate that [his] nonfrivolous legal claim ha[s] been frustrated or was being impeded" by the prison's program. *Id.* at 352-53 (footnotes omitted). In fact, "[f]ailure to show that a 'nonfrivolous legal claim ha[s] been frustrated' is fatal" to a prisoner's claim alleging denial of access to the courts. *Alvarez v. Hill*, 518 F.3d 1152, 1155 n.1 (9th Cir. 2008) (quoting *Lewis*, 518 U.S. at 353). This injury requirement cannot be waived because it "derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349. In addition to proving that he suffered an "actual injury," the prisoner must also prove that the this injury was proximately caused by the defendant's conduct. *Crumpton*, 947 F.2d at 1420.

In their brief, the Defendants point out that McKenzie has not presented evidence that he suffered an actual injury, which is an essential element of his claim for which he bears the burden of proof. *See Celotex*, 477 U.S. at 323. McKenzie admits that the Defendants' conduct did not cause any of his claims to be dismissed. (McKenzie Decl. in Support of CSMF ¶ 17.) Instead, McKenzie argues that he suffered an injury when "two file dates were extended because law library staff refused to schedule [McKenzie to use the library] until after these dates."

---

[16] For example, prison officials might legitimately experiment by "replac[ing] libraries with some minimal access to legal advice and a system of court-provided forms . . . that ask[] the inmates to provide only the facts and not to attempt any legal analysis." *Lewis*, 518 U.S. at 352.

(McKenzie Decl. in Supp. of CSMF ¶ 18.) McKenzie has not designated specific facts regarding these alleged extensions, such as the nature of the claim, the specific filing deadlines that were extended, and details that establish the causal link between the Defendants' conduct and the time extension.

In his amended complaint, McKenzie makes allegations that are even more general by stating that he "missed every filing date for these cases since February 12, 2007, as a result of the events described in this complaint." (Am. Compl. ¶ 18.) This assertion does not designate specific facts. Instead, it resembles a conclusory allegation, which is not sufficient to satisfy McKenzie's burden at this stage of summary judgment. *See Lujan*, 497 U.S. at 888. Furthermore, the Defendants have presented documentary evidence that, since February 12, 2007, McKenzie filed eighteen documents with the Oregon courts for his Criminal Appeal and sixteen documents for his Civil Appeal. (Andrew Aff., Ex. 1.)

Based on McKenzie's failure to designate specific facts in the record that demonstrate an injury, no reasonable jury could conclude that a "nonfrivolous legal claim ha[s] been frustrated or was being impeded" as a result of the Defendants' conduct. *Lewis*, 518 U.S. at 352-53.

    i.    <u>Denial of access to the law library</u>

McKenzie claims that his constitutional right of access to the courts was violated each time the Defendants prohibited him from using the prison's law library. Because the Defendants do not dispute that they denied McKenzie access to the prison's law library on several occasions, the court must simply decide whether the Defendants "are entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

FINDINGS AND RECOMMENDATION     19     {DL}

In *Lewis*, the Supreme Court clearly established that the constitutional right of access to the courts while in prison does not include "an abstract, freestanding right to a law library or legal assistance." *Lewis*, 518 U.S. at 351. "[P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Id.* (quoting *Bounds*, 430 U.S. at 825). Prison programs are constitutional if they sufficiently confer on the prisoners "the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Lewis*, 518 U.S. 356.

Before the Supreme Court's decision in *Lewis*, the Ninth Circuit used a two-step inquiry to evaluate claims of denial of access to prison law libraries. In *Sands v. Lewis*, 886 F.2d 1166, 1171 (9th Cir. 1989), the Ninth Circuit instructed courts evaluating a prisoner's claim of denial of access to the courts to "first determine whether the [prisoner] alleges inadequate law libraries or alternative sources of legal knowledge." *Id.* (citations and quotation marks omitted). "Second, if the claims do not involve such an allegation, the court must consider whether the plaintiff has alleged an 'actual injury' to court access." *Id.* In *Lewis*, the Supreme Court overruled this two-step analysis by requiring an inmate to show an "actual injury" as an element in both of the above situations. *Lewis*, 518 U.S. at 351. Thus, the law is clear that McKenzie cannot prevail on his claim by merely proving that he was denied access to the law library without also proving that he suffered an actual injury as a result. As discussed above, McKenzie has not designated specific facts that would allow a reasonably jury to conclude that he suffered an actual injury or that such an injury was caused by the Defendants.

FINDINGS AND RECOMMENDATION        20                              {DL}

ii.    Confiscated Legal Materials

McKenzie alleges that the Defendants confiscated and refused to return some of his legal materials. He also alleges that the Defendants searched his cell and destroyed or damaged his legal materials. The Defendants do not challenge the veracity of these allegations, so there is no dispute of fact on this issue. The narrow question before the court is whether the Defendants' conduct rises to the level of a constitutional violation. If it does not, the Defendants are entitled to judgment as a matter of law on this issue.

McKenzie bears the burden of presenting evidence that the Defendants proximately caused an "actual injury" as a result of confiscating his legal documents. *See Lewis*, 518 U.S. at 349. The court agrees with the Seventh Circuit's approach for this type of claim, under which the prisoner must "state[] with specificity exactly what materials he was deprived of and how such deprivation resulted in his being denied the meaningful access to the courts to which he is entitled." *Hossman v. Spradlin*, 812 F.2d 1019, 1022 (7th Cir. 1987). The only two documents that McKenzie specifically identified are "Secrets of an Internet Outlaw"[17] and "Secrets of Lock Picking." (Plaintiff's Supp. Response to Mot. for Summ. Judgment, Ex. 8 at 2-3, ¶ 15.) McKenzie states that these documents are "part of the trial court record as pieces of evidence placed before the jury in Multnomah County Case No. 0412-37008" and that the Defendants confiscated them and have not returned them. (Plaintiff's Supp. Response to Mot. for Summ. Judgment, Ex. 8 at 2-3, ¶ 15.) This allegation is not sufficient to show an "actual injury" as

---

[17] See note 12 *supra*.

FINDINGS AND RECOMMENDATION         21                        {DL}

required by *Lewis*, as McKenzie present no evidence of how confiscation of these materials resulted in actual injury to him.

     iii.    Denial of Legal Envelopes

McKenzie claims that he was denied access to the courts when the Defendants denied his request for "indigent legal envelopes" on November 7, 2007. (Am. Compl. ¶ 39.) In 1977, the Supreme Court stated that "[i]t is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents with notarial services to authenticate them, and with stamps to mail them." *Bounds*, 430 U.S. at 824-25. While reading this passage in isolation may give the impression that a prisoner who has not received the stationary necessary to draft and mail court documents has a claim under Section 1983, reading this passage within the context of the case makes it clear that this is not so. The Supreme Court was discussing the constitutional requirement that the prison's *policies* provide inmates with "meaningful access" to the courts. *See id.* at 825. The Supreme Court added context by stating that "[t]his is not to say that economic factors may not be considered, for example, in choosing the methods used to provide meaningful access. But the cost of protecting a constitutional right cannot justify its total denial." *Id.* In essence, the Supreme Court was articulating the *general* requirement that a prison provide stationary resources to prisoners. Although a wholesale denial of stationary and stamps fails to comply with constitutional mandates, it does not follow that prison officials must grant every request made for such resources.

The issue turns on whether denial of stamps or stationary on one occasion is sufficient to give rise to a claim for denial of access to the courts under Section 1983. Guidance on this issue

FINDINGS AND RECOMMENDATION     22     {DL}

is provided by *King v. Atiyeh*, 814 F.2d 565 (9th Cir. 1987). In *King*, inmates at Oregon State Hospital claimed that their constitutional right to access the courts was violated by the hospital's policy of providing indigent patients with only three stamps per week. *Id.* at 568. "The district court dismissed this claim, holding that [the plaintiffs] failed to allege that the state's policy actually interfered with their or any similarly situated individual's access to the courts." *Id.* The Ninth Circuit reversed, holding that "a close reading of the complaint" provided the necessary factual allegation to survive dismissal. *Id.* The complaint "alleged that 'plaintiffs have often found it necessary to communicate with the courts more than three (3) times per week and often the pleadings need more than twenty (20) cents postage.'" *Id.* (footnote omitted). The Ninth Circuit's result and reasoning indicate that the mere denial of stamps is not sufficient to entitle a prisoner to relief under Section 1983; the prisoner must also submit evidence that the denial of stamps actually interfered with the prisoner's access to the courts.

Unlike the outcome in *King*, a close reading of McKenzie's complaint does not yield the factual allegation necessary to connect a denial of legal envelopes to denial of access to the courts. McKenzie's only statement on the matter is that "[he] was denied access to the court, by defendant Rossi-Hill when he was denied indigent legal envelopes to prevent his serving the original complaint properly." The first part of McKenzie's sentence, the claim that "[he] was denied access to the court," is merely conclusory and does not allege any facts. The final part of the sentence, "to prevent his serving the original complaint properly," is likewise void of the necessary allegations. This phrase merely alleges the motive with which Rossi-Hill denied McKenzie legal envelopes. The complaint does not allege that McKenzie was actually

FINDINGS AND RECOMMENDATION        23                        {DL}

prevented from filing the "original complaint" or that he suffered any other prejudice or frustration as a result of being denied envelopes.

In sum, the *King* plaintiffs would not have been able to survive dismissal by merely alleging that their communication with the courts was impeded by the denial of sufficient stamps. Instead, it was necessary for the plaintiffs to tie the denial of stamps to an injury. In contrast to the *King* plaintiffs, McKenzie has not alleged that the lack of legal envelopes on November 7, 2007, has had any effect on his ability to access and utilize the court system, but states only that he requested envelopes and that his request was denied. (Am. Compl. ¶ 39.) Without specific facts showing that McKenzie suffered an injury by being denied legal envelopes, the Defendants are entitled to judgment as a matter of law, and the court should grant summary judgment to the Defendants on this issue.

B.     Due Process

McKenzie claims that his right to due process was violated at several disciplinary hearings. "Under the Fourteenth Amendment's Due Process Clause, a prisoner is entitled to certain due process protections when he is charged with a disciplinary violation." *Serrano v. Francis*, 345 F.3d 1071, 1077-78 (9th Cir. 2003) (citing *Wolff v. McDonnell*, 418 U.S. 539, 564-71 (1974)). Of course, "[l]awful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen," and although prisoners still retain Constitutional protections of religious freedom, access to the courts, Equal Protection, and substantive due process, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff*, 418 U.S. at 555-56. For

example, unlike a defendant's silence in criminal a proceeding, a prisoner's silence at a disciplinary hearing may be used as evidence against him. *Baxter v. Palmigiano*, 425 U.S. 308, 316-18 (1976). As a second example, prisoners "do not 'have a right to either retained or appointed counsel in disciplinary hearings.'" *Id.* at 315 (quoting *Wolff*, 418 U.S. at 570).

In *Wolff*, 418 U.S. at 564, the Supreme Court discussed the due process requirements of a prison disciplinary hearing. First, prison officials must provide the prisoner with written notice at least twenty-four hours before the hearing. *Id.* This notice must include the charges against the inmate, a written description of the evidence on which the factfinder relies, and the reason for taking disciplinary action. *Id.* Second, prison officials should allow the prisoner "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Id.* at 566. Third, if the prisoner is illiterate, or if the complexity of the case makes comprehension unlikely, prison officials should allow the prisoner to "seek the aid of a fellow inmate, or if that is forbidden, to have . . . help from the staff or from a sufficiently competent inmate designated by the staff." *Id.* at 570.

McKenzie does not claim that he received insufficient notice or that he was unfairly denied the ability to call witnesses or present evidence in his defense. He also does not claim that he is in need of assistance because he is illiterate or because the case is complex. Instead, McKenzie argues that Hearings Officer Myers violated McKenzie's right to due process when he relied on insufficient evidence to make a disciplinary decision.

The Supreme Court has held that the evidentiary standard required at a disciplinary hearing is far less stringent than that required for a criminal conviction in the courts of law. *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985). "[T]he requirements of due process are satisfied if *some evidence* supports the decision by the prison disciplinary board . . . ." *Id.* (emphasis added). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455-56.

In this case, there are numerous undisputed facts upon which Hearings Officer Myers relied before deciding to discipline McKenzie. Hearings Officer Myers interviewed witnesses and reviewed documentary evidence. This certainly meets or exceeds the "some evidence" standard and, thus, the evidentiary due process requirements for a prison disciplinary hearing have been satisfied.

McKenzie also claims that his right to due process was violated when the Defendants misinterpreted the ODOC rules. The ODOC regulations prohibit inmates from possessing legal materials that belong to other inmates and from performing unauthorized work on the ODOC computer equipment. (Defendants' CSMF ¶ 5.) McKenzie does not read the ODOC rules so simply. (Plaintiff CSMF ¶ 5.) Under McKenzie's interpretation, the rule prohibits one inmate from extorting or paying another inmate for legal assistance, but it allows sharing legal work if there is no payment or extortion. (Am. Compl. ¶ 17.) McKenzie also challenges the meaning of "unauthorized" and the meaning of "belonging to another inmate." (Plaintiff's CSMF ¶ 8.)

McKenzie argues that the ODOC rules allow him to possess copies of other inmates' legal documents if those documents have been filed with a court because "this is public record." (McKenzie's Decl. in Support of CSMF ¶ 10.)  McKenzie also challenges the Defendants' interpretation of the prison's rule requiring prisoners to promptly follow the direct orders of the correctional officers and staff.  (McKenzie Decl. in Support of Plaintiff's CSMF at 2-3 ¶ 8.) McKenzie admits that he did not "instantly" follow Rossi-Hill's direct order to stop leaving the law library, but he argues that his eventual compliance with her order should be sufficient to satisfy the rule.  (McKenzie Decl. in Support of Plaintiff's CSMF at 2-3 ¶ 8.)  Aside from his own semantic conclusions, McKenzie has not presented any evidence in support of his interpretation, which, in any event, is not supported by the rules' plain wording.  Thus, he has not created a genuine dispute of fact.  Furthermore, as a matter of law, misinterpretation of the prison's rules at a disciplinary hearing does not constitute a violation of a prisoner's constitutional right to due proces.  The proper recourse for McKenzie in this situation would be a review of Hearing Officer Myers's decision, not a constitutional claim for violation of due process.

    C.    <u>Retaliation</u>

McKenzie claims that the misconduct report for the incident on February 9, 2007, the misconduct report for the incident on June 6, 2007, the confiscation of McKenzie's legal materials, the "strip search" (Am. Compl. ¶ 49.), and the search of McKenzie's cell were all motivated by the Defendants' intent to retaliate against McKenzie for filing grievances and complaints against them (McKenzie Decl. in Support of CSMF at 6 ¶ 26.).

FINDINGS AND RECOMMENDATION     27          {DL}

"Deliberate retaliation by state actors . . . is actionable under [S]ection 1983." *Soranno's Gasco*, 874 F.2d at 1314 (citing *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988)). "A prisoner suing prison officials under [S]ection 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline." *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam). When analyzing a retaliation claim, the court "should 'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)).

To prove retaliation, McKenzie must establish a causal link between the protected conduct and the Defendants' retaliatory actions. *See, e.g., Pratt*, 65 F.3d at 807 (reversing because "there [was] no probative evidence to establish a crucial link in the logical chain required to support the district court's finding of retaliation."). In *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-86 (1977), the Supreme Court explained the "rule of causation" that courts should apply to retaliation claims. *Id.* The Ninth Circuit summarized this rule and its burden-shifting analysis as follows:

> In *Mt. Healthy*, the [Supreme] Court held that a plaintiff alleging retaliation for the exercise of constitutionally protected rights must initially show that the protected conduct was a "substantial" or "motivating" factor in the defendant's decision. At that point, the burden shifts to the defendant to establish that it would have reached the same decision even in the absence of the protected conduct.

FINDINGS AND RECOMMENDATION        28                    {DL}

*Soranno's Gasco*, 874 F.2d at 1314 (citations omitted).

In this case, McKenzie has not presented evidence that his constitutionally protected actions were a substantial or a motivating factor in the Defendants' decisions to file misconduct reports against him, confiscate his legal materials, search his person, and search his cell. McKenzie simply makes the conclusory allegation that the Defendants acted in retaliation. Furthermore, McKenzie offers no evidence to refute that Defendants' actions were taken for the legitimate penological reasons of enforcing ODOC rules that McKenzie was suspected of violating and subsequently determined to have violated. Because he has not designated specific facts in the record that indicate that the Defendants actions were motivated by retaliation, summary judgment should be granted in favor of the Defendants.

D.    Redacted Documents

McKenzie also claims that his constitutional rights were violated when the Defendants redacted portions of the documents requested by McKenzie during the discovery phase of a habeas corpus proceeding. The court does not recognize a constitutional right by a prisoner to obtain uncensored documents from the department of corrections. Failure to comply with discovery requests might give rise to a cause of action, but that cause of action is not a suit under Section 1983 for a constitutional violation.

*Conclusion*

Because there is no dispute of material fact and the Defendants are entitled to judgment as a matter of law, the Defendants' motion (#46) for summary judgment should be GRANTED.

///

*Scheduling Order*

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due October 19, 2009.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 5th day of October, 2009.

JOHN V. ACOSTA

United States Magistrate Judge

FINDINGS AND RECOMMENDATION          30                              {DL}